NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0239n.06

No. 22-5591

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 12, 2025
KELLY L. STEPHENS, Clerk

SONYA P. WILLIAMS,

    Plaintiff-Appellant,

v.

SHELBY COUNTY, TENNESSEE, BOARD
OF EDUCATION,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF TENNESSEE

OPINION

Before: BATCHELDER, GRIFFIN, and WHITE, Circuit Judges.

WHITE, J., delivered the opinion of the court in which BATCHELDER and GRIFFIN, JJ., concurred. BATCHELDER, J. (pg. 31), delivered a separate concurring opinion.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Sonya Williams brought claims under state and federal law against her former employer, Defendant-Appellee Shelby County Board of Education. The district court awarded Williams damages on one state-law claim but granted judgment for the Board on the remaining claims. Williams appeals, seeking additional damages for the lone claim on which she prevailed, and reversal and remand on the remaining claims. Because the district court incorrectly granted judgment for the Board on Williams's § 1983 procedural-due-process claim, but did not otherwise err, we REVERSE and remand for further proceedings as to that claim, and AFFIRM in all other respects.

## I.  Background

### A.  Factual Background

Plaintiff-Appellant Dr. Sonya Williams is a teacher with several decades of experience. Williams began working for Defendant-Appellee, the Shelby County, Tennessee, Board of Education in 2002. The Board granted Williams tenure in 2006. In 2013, Williams filed an EEOC charge against the Board, alleging age and race discrimination. That dispute was ultimately settled. As part of that settlement, the Board offered Williams a job as an Adult Education Advisor at Messick Adult Center—a facility that offered classes for adults. The Board called the operations at Messick the "Adult Education Program." This Program was funded mostly through a grant from the State of Tennessee, but the Board "supplemented" a portion of that funding. R. 60, PID 1748. Williams accepted the offer and began working at Messick in 2015.

Soon after arriving at Messick, Williams told school principal Rochelle Griffin and the Board that she believed Messick was violating state rules related to the ethical use of grant funding. In October and December 2015, state inspectors visited Messick to evaluate its compliance with state funding rules. During those visits, Williams told the inspectors that she believed Messick was not complying with numerous funding requirements, including rules regarding orientation, testing security, non-grant employees being paid with grant funds, and non-grant employees using grant-funded equipment.

Williams alleges that as she began voicing these complaints, Principal Griffin and other school employees began harassing her. For example, Griffin constantly mentioned that Williams had obtained her job through an EEOC settlement, complaining that Williams "didn't interview for the position," and that Williams "ain't got no recommendation." R. 48, PID 563–64, 576, 588–89. Griffin cut Williams' responsibilities and micromanaged her tasks. Griffin also told Williams

2

that her "continued employment at Messick" was "adverse to the entire Adult Education Program." R. 48, PID 1518. Meanwhile, Chantay Branch—the Board's Labor Relations Director—told Williams that her "reporting to the State" had made Williams' relationship with Griffin "irreparable," and "put[] the district in jeopardy." *Id.* at 780.

In February 2016—halfway through Williams' first schoolyear at Messick—the state revoked the grant that funded the Adult Education Program. According to a memorandum prepared by Board assistant-superintendent Joris Ray, the state officially documented the revocation as being "without cause." R. 60, PID 1803. But when state officials visited Messick to announce the grant revocation, they explained that "several factors" went into the decision, including "low instructional staff participation" in a state-led training program and "failure to meet program performance measures." *Id.* at 1803–04. The state official also mentioned "what he observed as a lack of leadership in place at Messick . . . for extended periods of time and the 'toxic relationship that ensued upon the arrival of Dr. (Sonya) Williams.'" *Id.* at 1804. Beyond that, it is unclear what role Williams's reporting played in the grant-revocation decision.

Once the grant was revoked, the Board superintendent—Dorsey Hopson—chose to terminate the entire Adult Education Program. On February 8, 2016—less than a week after the state revoked the grant—Hopson sent Williams and other teachers a form letter. That letter stated that the state had cut the "funding for the Adult Education Program," and, as a result, the recipients' "employment will be terminated." R. 122-5, PID 3330. The letter also clarified that if a teacher was "employed with the district in another capacity outside of the Adult Education Program," that other position would "not be impacted." *Id.*

Under a Tennessee statute called the Tenure Act, when a school conducts a reduction-in-force, the decision must be made by the school board itself—rather than a principle or

superintendent—and certain high-performing teachers must be put "on a list for reemployment." Tenn. Code Ann. § 49-5-511(b)(1). Here, the Board did not ratify the termination of Williams until several years after she was fired. In late 2016, the Board issued a resolution in which it purported to "ratify[]" the terminations of certain teachers that had been fired as part of reductions-in-force between 2013 and 2016. R. 122-1, PID 3302-3310. That resolution did not include Williams. In October 2018—more than two years after Williams was fired and more than one year after she filed this suit—the Board issued a new resolution stating that it had "recently" learned that several teachers who had been terminated had been "inadvertently omitted" from the 2016 resolution. R. 122-3, PID 3325. The Board then ratified the firing of those employees, including Williams.

The Board also did not add Williams to the reemployment list immediately after terminating her employment in 2016. According to the Board's staffing manager, Eddie Jones, the Board had not added new teachers to the reemployment list for several years because the Board did not "have the vacancies filled that we needed," so Superintendent Hopson decided "not to have any individuals put on that list in addition to what we already had." R. 314, PID 8253–54. Prior to 2016, the Board had kept its reemployment list in software called ZOHO. But the Board eventually "phased out ZOHO" and replaced it with software called SharePoint. *Id.* at 8255. Because of the software change, the Board for several years did not keep its reemployment list in "one central place." *Id.* at 8257. In January 2019, Eddie Jones sought to consolidate a central reemployment list in SharePoint. He exchanged emails with several other administrators to create an "updated list." *Id.* The consolidated list produced in that email exchange included Williams's name. Jones eventually uploaded that list to SharePoint.

## B. Procedural History

In January 2017, Williams filed this action against the Board. She raised five claims: (1) retaliation under Title VII of the Civil Rights Act of 1964, (2) retaliation under the First Amendment, (3) a claim for retaliatory termination under the Tennessee Public Protection Act (TPPA), *see* TCA § 50-1-304, (4) a claim under the Tennessee Tenure Act, *see* Tenn. Code Ann. § 49-5-501 *et seq.*, and (5) a claim under 42 U.S.C. § 1983 for violation of her procedural-due-process rights. She also raised a First Amendment "Prior Restraint of Speech" claim, but she abandoned it early in litigation.

The Board moved for summary judgment on all claims. The district court granted summary judgment on the First Amendment retaliation claim, the TPPA claim, and the § 1983 procedural-due-process claim. The district court denied summary judgment on the Tenure Act claim, holding that a reasonable jury could find that the Board violated the Tenure Act by failing to ratify Williams' termination. The district court divided Williams's Title VII claim into three categories: (1) retaliatory termination, (2) retaliatory failure-to-rehire, and (3) retaliatory harassment, performance reviews, and reprimands. It granted summary judgment for the Board on the retaliatory-termination claim, held that Williams failed to exhaust the failure-to-rehire claim before the EEOC, and allowed the third category to proceed to trial, concluding that a reasonable jury could find that Williams suffered retaliatory harassment, performance reviews, and reprimands.

Soon after the district court's summary-judgment ruling, the Board notified the court that the Board's counsel had inadvertently omitted relevant evidence from the summary-judgment record. The Board explained that it had ratified Williams's termination in October 2018—several months *before* the district court ruled on the summary judgment motion. But the Board's counsel did not learn of the ratification until *after* the order was filed. Around the same time, the Board's

designated Rule 30(b)(6) witness—staffing manager Eddie Jones—testified at his deposition that the Board had not added Williams to the reemployment list when she was terminated. Given those admissions, the district court concluded that the Board had likely violated the Tenure Act. But it was unsure of the appropriate remedy under state law. The district court thus certified to the Tennessee Supreme Court the question whether a teacher is "entitled to back pay damages when the school board fails to act as the final decision-maker on her termination," "or when the board does not place a qualified teacher on a reemployment list." R. 192, PID 5430. The Tennessee Supreme Court declined to accept the case. Forced to decide the issue itself, the district court held that Williams was entitled to backpay damages from the date she was fired until the date the Board ratified her termination in October 2018, but that she was not entitled to any further damages for the Board's delay in placing her on the reemployment list.

Midway through the district court proceedings, Williams discharged her attorneys and chose to proceed pro se. Williams then filed a pro se motion asking the district court to reconsider all the claims it had disposed of at summary judgment. The district court agreed to reverse its grant of summary judgment as to the § 1983 procedural-due-process claim. Williams had argued that the Board violated her due-process rights by failing to "place her name on the reemployment list." R. 220, PID 6320. The district court had originally granted summary judgment on that claim because Williams had presented "no evidence" that the Board excluded her from the list. *Id.* But because the Board's designated witness had since admitted that the Board did not put Williams on a reemployment list for at least some period after Williams was terminated, the district court revived Williams's § 1983 claim and scheduled a trial to determine "whether Defendant ever placed Plaintiff's name on the reemployment list." *Id.* at 6323. The district court declined to reconsider Williams's remaining claims.

Williams then abandoned her Title VII retaliation claim that was based on harassment, reprimands, and negative performance reviews—i.e., the Title VII claim that had survived summary judgment. Thus, all that remained for trial was Williams' § 1983 procedural-due-process claim related to the Board's alleged failure to place her on a reemployment list. After a two-day bench trial, the district court granted judgment for the Board on that claim.

Williams now appeals, arguing: (1) she should receive additional damages for her Tenure Act claim, (2) the district court's grant of judgment for the Board on the § 1983 claim should be reversed, and (3) the district court's grant of judgment for the Board on the retaliatory-termination claims under Title VII and the TPPA should be reversed.

## II. Analysis

### A. Tenure Act Damages

The Tennessee Tenure Act, *see* Tenn. Code Ann. § 49-5-501 *et seq.*, "protect[s] school teachers from arbitrary demotions and dismissals." *Thompson v. Memphis City Sch. Bd. of Educ.*, 395 S.W.3d 616, 623 (Tenn. 2012) (quotations omitted). Section 49-5-511 of the Act provides the process that Tennessee public schools must follow in dismissing or suspending teachers. Under that provision, a teacher can be fired in two ways. First, a school board may fire a teacher for cause—i.e., based on the teacher's "incompetence" or "unprofessional conduct," Tenn. Code Ann. § 49-5-511(a)(2). Second, a school board may fire a group of teachers "[w]hen it becomes necessary to reduce the number of teaching positions . . . in the system." *Id.* § 49-5-511(b). The Board refers to this latter form of termination as a "reduction-in-force" or an "excess."

When a board chooses to excess teachers, it is bound by the Tenure Act to follow several procedural rules. First, the Act requires the firing decision to be made by the *school board* itself— the board cannot delegate the decision to a principal or superintendent. *Id.* § 49-5-511(b)(1)-(3).

If an individual administrator purports to excess a teacher, that excess is not effective until ratified by the Board. *See Kelley v. Shelby Cnty. Bd. of Educ.*, 751 F. App'x 650, 655 (6th Cir. 2018). Also, after excessing certain high-performing teachers, the board must place those teachers "on a list for reemployment." Tenn. Code Ann. § 49-5-511(b)(3).

Williams claims that the Board did not comply with these requirements. To start, the Board did not ratify her excess until October 2018, more than two years after she received a termination letter. Williams also argues that the Board never placed her on a reemployment list, although it is undisputed that Williams was sufficiently high-performing to qualify for placement on that list.

The district court awarded Williams backpay damages from her 2016 firing to the Board's 2018 ratification of the firing. The Board has not appealed that ruling. But Williams argues that the Tenure Act entitles her to additional backpay because even after the Board ratified her termination, it still failed to put her on a reemployment list. The district court disagreed, holding that "whether Defendant placed Plaintiff on the reemployment list does not affect the calculation of her damages under the Tenure Act." R. 237, PID 6943.

The crucial question here is whether the Tenure Act permits backpay damages for a school board's failure to put an excessed teacher on a reemployment list. When this court interprets state law, it "must predict how the state's highest court would interpret the statute." *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2008). Most relevant in this analysis are "final decisions of that state's highest court." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358 (6th Cir. 2013). If "state supreme court decisions are inconsistent," this court generally gives greater weight to "the last decision in which . . . [the state's] highest court addressed the issue." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 203 (6th Cir. 2016). This court may also consider

"intermediate state appellate courts' decisions," which are "persuasive unless it is shown that the state's highest court would decide the issue differently." *Conlin*, 714 F.3d at 359 (cleaned up).

Applying those principles, we conclude that Williams is not entitled to backpay for the Board's failure to place her on a reemployment list.

### 1. The Tennessee Supreme Court would likely hold that the Tenure Act does not permit backpay as a remedy for a school board's mere failure to put an excessed teacher on a reemployment list.

The Tennessee Supreme Court "give[s] effect to the legislature's intent" by applying a statute's "text without broadening or narrowing its intended scope." *Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 168 (Tenn. 2022). It is "not the role of th[e] Court to rewrite the statute in order to remedy any perceived unfairness." *Calaway ex rel. Calaway v. Schucker*, 193 S.W.3d 509, 517 n.2 (Tenn. 2005).

The Tenure Act does not state that a school board must award backpay when it fails to put an excessed teacher on a reemployment list. It does, however, expressly permit backpay damages in *different* circumstances: If a school board "suspend[s] a teacher . . . pending investigation," and the teacher is later "vindicated or reinstated," "the teacher shall be paid the full salary for the period during which the teacher was suspended." Tenn. Code Ann. § 49-5-511(a)(3). This suggests that when the Tennessee Legislature intends to authorize backpay damages, it does so expressly. The Tennessee Supreme Court presumes "that the Legislature means what it says," "and does not mean what it does not say." *Effler v. Purdue Pharma L.P.*, 614 S.W.3d 681, 688 (Tenn. 2020). So when the Legislature has "carefully" legislated in a particular area, Tennessee courts presume that any "missing statutory provision is missing for a reason—the Legislature never meant to include it." *Id.* at 689 (quotation omitted).

As the Board notes, the Tennessee Supreme Court recently applied these principles to deny backpay damages where the Tenure Act did not expressly authorize them. *See Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 145 (Tenn. 2017). In *Emory*, a school board sought to fire a teacher and the teacher requested a pre-termination hearing. The Tenure Act requires a school board to hold such a hearing within "thirty . . . days following receipt" of the teacher's request. Tenn. Code Ann. § 49-5-512(a)(2). The school board held the hearing eleven months too late. *See Emory v. Memphis City Sch. Bd. of Educ.*, No. W2014–01293–COA–R3–CV, 2015 WL 1934397, at *2 (Tenn. Ct. App. Apr. 29, 2015). The Tennessee Court of Appeals awarded the teacher backpay for the school board's eleven-month delay, *id.* at *7, but the Tennessee Supreme Court reversed, *Emory*, 514 S.W.3d at 145. The state supreme court explained that the thirty-day-provision "carries no specific penalty for noncompliance," and judges "are not at liberty to rewrite statutes." *Id.* The court thus vacated the damages award because the "remedy crafted by the Court of Appeals is not contained in the Tenure Act." *Id.*

Here, as in *Emory*, the Tenure Act provides "no specific penalty for noncompliance" with the reemployment-list provision. *Id.* Here, as in *Emory*, the remedy Williams asks this court to craft—backpay for the time Williams was not on the reemployment list—is "not contained in the Tenure Act." *Id.* And so here, as in *Emory*, this court cannot provide an extra-statutory monetary remedy.

*Thompson v. Memphis City School Board* does not change that conclusion. 395 S.W.3d 616 (Tenn. 2012). In *Thompson*, a school administrator attempted to fire a teacher for cause. *Id.* at 619. Under the Tenure Act, a school board must follow "certain procedures . . . *before*" firing a tenured teacher for cause, including, among other things, providing written notice of charges. *Id.* at 623 (citing Tenn. Code Ann. § 49-5-512(a)). But the plaintiff teacher in *Thompson* "received

absolutely none of the pre-termination protections the Tenure Act provides." 395 S.W.3d at 624. The Tennessee Supreme Court acknowledged that "[n]o statute addresses the appropriate remedy for a tenured teacher in [these] circumstances" because the statute "does not contemplate" a teacher's being fired in the way the plaintiff had been. *Id.* at 628. But the court reasoned that when a teacher's employment is "terminated in violation of the Tenure Act," she is analogous to a teacher who has been suspended without pay. *Id.* And when a suspended teacher is later "vindicated," the Tenure Act requires she be paid her "full salary" for the period of her suspension. *Id.*; *see* Tenn. Code Ann. § 49-5-511(a)(3). Thus, because an unlawful termination is similar to a suspension-without-pay, the "full salary" provision "provides the appropriate remedy." *Id.*

*Thompson* is clearly in some tension with *Emory*. If that tension cannot be reconciled, this court should follow *Emory* because when state supreme court opinions are "inconsistent," "the last decision" controls. *Nichols*, 811 F.3d at 203. *Emory* is the Tennessee Supreme Court's last word on the issue, so it is a better predictor of how the court would decide this matter going forward.

But even on its own terms, *Thompson* does not support awarding backpay for a failure to put a teacher's name on a reemployment list. *Thompson* dealt with the procedures a school board must follow "*before* a tenured teacher is dismissed." *Id.* at 623. A teacher fired in violation of those procedures has not been properly fired at all and is thus analogous to a teacher who has been improperly suspended without pay. *Id.* at 623, 628. In both instances, the school board has improperly stopped paying the teacher her salary. So it makes sense to award the teacher the salary she would have earned if the board had not unlawfully fired or suspended her.

But that logic does not apply here. Once the Board ratified Williams's termination, she *was* lawfully fired. From that point forward, she had no claim to her salary—regardless whether she was on the reemployment list. So the Tennessee Supreme Court would likely hold that she is

11

not entitled to backpay for the period during which she was properly fired but improperly excluded from the list.

### 2. Williams's counterarguments are unpersuasive.

Williams responds by citing two Tennessee cases pre-dating *Emory*, and by arguing that *Emory* is distinguishable.

First, Williams cites cases in which Tennessee courts awarded backpay damages to excessed teachers: *Randall v. Hankins*, 733 S.W.2d 871 (Tenn. 1987), and *Lee v. Franklin Special Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322 (Tenn. App. Ct. 2007). Williams asserts that these cases establish that "backpay [is] the appropriate remedy" for a violation of the reemployment list provision. Appellant's Supplemental Reply at 3. Williams overstates both cases.

We start with *Randall v. Hankins*, 733 S.W.2d 871 (Tenn. 1987). The Tennessee Supreme Court did not decide the propriety of backpay damages in that case because the issue was not presented on appeal. In *Randall*, a school board declined to re-hire several teachers who were excessed in the early 1980s. *Id.* at 872. During that time, the school board did not keep a written reemployment list as required. *Id.* at 874. The teachers sued under the Tenure Act and sought two remedies: backpay and reinstatement to their prior jobs. *Id.* at 872. The Tennessee Court of Appeals initially granted both remedies—but after a remand to the trial court, the court of appeals awarded backpay and denied reinstatement. *Id.* From there, the teachers appealed the court of appeals' reinstatement denial, but the school board "made no issue concerning the back pay award." *Id.* at 873.

Thus, the issue before the Tennessee Supreme Court was whether the teachers were "entitled to a peremptory order . . . directing that they be reinstated." *Id.* The Tennessee Supreme Court held that the teachers were not entitled to that relief because the Tenure Act does not

12

"mandate" that a school board "grant automatic reemployment." *Id.* at 874. As for the unappealed backpay, the Tennessee Supreme Court merely noted that the court of appeals had ordered the school board to "fully compensate[]" the teachers. *Id.* at 875. And it stated that the teachers might bring another "action" for "further back pay" if they believed the school board stopped providing "[statutory priority] . . . in subsequent school years." *Id.* These observations about a hypothetical future suit involving an unchallenged remedy do not overcome *Emory*'s more recent holding that courts should not award backpay damages where the Tenure Act does not expressly authorize them.

Of course, in *Randall*, the Tennessee Court of Appeals *did* award backpay damages. *Randall v. Hankins*, 675 S.W.2d 712, 714 (Tenn. Ct. App. 1984). But that court's opinion involved no analysis of the appropriate remedy. Indeed, the opinion mentioned "back pay" once—in the opening paragraph, where it stated that the plaintiffs sought "reinstatement . . . and back pay." *Id.* at 713. Beyond that, the opinion focused entirely on whether the school board violated the statute. *Id.* at 713–14. The court concluded that the board violated the Tenure Act by declining to re-hire plaintiffs without making an official "determination" of the plaintiffs' "fitness or unfitness" for available vacancies. *Id.* at 713. Thus, the plaintiffs were entitled to "a judgment for the financial losses" they "suffered." *Id.* at 714. That sparse analysis reflects no consideration of the issue the Tennessee Supreme Court has since deemed central: whether the Tenure Act authorizes a court to award the monetary damages sought. *See Emory*, 514 S.W.3d at 145.

Moreover, in the interim since *Randall*, the Tennessee General Assembly has amended the Tenure Act. When the *Randall* plaintiffs sued, the reemployment list provision stated that an excessed teacher "shall be placed on a preferred list for reemployment in the first vacancy he is qualified by training and experience to fill," and that the school board had "the power to determine

the fitness of such teacher for reemployment in such vacancy." *Id.* at 713 (quoting the 1984 version of the statute). Relying on that language, the Tennessee Court of Appeals concluded that the Tenure Act "vested in the school board the duty to determine the fitness of a preferred list teacher." *Id.* And "in the absence of a finding of unfitness on the part of the board, the statute clearly mandates that the board must hire the teacher on the preferred list." *Id.* The school board in *Randall* had not formally determined plaintiffs were unfit, but it had declined to re-hire them anyway. *Id.* at 713–14. That is why the court of appeals held that the board violated the statute—not because it excluded plaintiffs from a reemployment list, but because it "denied plaintiffs the preference" of being re-hired without formally finding them unfit. *Id.* at 714.

But in 2014, the General Assembly amended the statute to remove the language on which the *Randall* court of appeals' opinion rests. Specifically, the legislature removed the word "preferred" and the phrase "in the first vacancy he is qualified by training and experience to fill." Thus, today's statute merely states that an excessed teacher "shall be placed on a list for reemployment"—without reference to whether that list carries any benefit with respect to any vacancy. Tenn. Code Ann. § 49-5-511(b)(3) (2024). It also now states that a "principal may refuse" to hire an excessed teacher to fill a vacancy at his school—even if that teacher has been deemed fit by the board or the superintendent. *Id.* So while the *Randall* plaintiffs obtained backpay on the premise that they were statutorily entitled to "fill the first vacancy" for which the Board did not deem them unfit, *Randall*, 675 S.W.2d at 713–14, this statute no longer states a preference for "the first vacancy [Williams] is qualified by training and experience to fill."[1]

---

[1] Williams notes that although the General Assembly removed the word "preferred" from the reemployment list provision in Tenn. Code Ann. § 49-5-511(b)(3), the very next subsection continues to state that an excessed teacher has the "right to remain on the *preferred* list for employment." *Id.* § 49-5-511(b)(4) (emphasis added). It is unclear why the legislature removed "preferred" from one subsection but left it in place elsewhere. But the General Assembly

Williams's other case, *Lee v. Franklin Special Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322 (Tenn. App. Ct. 2007), was also decided before the reemployment-list provision was amended. There, the school board placed the plaintiff teacher on a reemployment list, but school principals declined to hire her for the vacancies she sought. *Id.* at 336–37. Applying the prior version of the statute, the court of appeals held that the plaintiff was "entitled to preference for the *first vacancy* for which she was qualified," and that "only the Board"—not a principal—could decline to re-hire her. *Id.* at 333, 336. Because the Board itself had not found the plaintiff unfit for the first vacancy she sought, the court reasoned that the plaintiff "was statutorily entitled to be offered reemployment for that position." *Id.* at 336. The court thus awarded the plaintiff damages equal to the salary she would have earned had the school board placed her in that vacancy. *Id.* at 337. Once again, it is unlikely that this reasoning survives under today's statute.

Williams cites no case in which a Tennessee court awarded backpay for a violation of the current version of the reemployment list provision. As the district court explained in seeking to certify this issue to the Tennessee Supreme Court, *Randall* and *Lee* awarded backpay "in the context of the school board's failure to give a teacher the preference for reemployment provided for under the previous version" of the statute. R. 192, PID 5426–27. But the Tenure Act "no longer" provides the same "preference to teachers on the reemployment list." *Id.*

In any event, these opinions are from the court of appeals. This court's task is to predict how the "state's *highest* court" would interpret the statute, so "intermediate state appellate courts' decisions" are not "persuasive" where it appears that the state supreme court "would decide the issue differently." *Conlin*, 714 F.3d at 358–59 (emphasis added). If *Randall* and *Lee* conflict with

did not just remove the word "preferred," it also removed "in the first vacancy he is qualified by training and experience to fill," and clarified that a "principal may refuse" to hire an excessed teacher. Taken as a whole, it is unlikely that these changes were intended only as minor linguistic tweaks, as Williams asserts.

the Tennessee Supreme Court's bar on court-created Tenure Act remedies in *Emory*, then *Emory* controls.

*Second*, Williams argues she has suffered more "prejudice" than the plaintiff teacher in *Emory*. Appellant's Supplemental Reply Brief at 6–8. But that is precisely the kind of analysis the Tennessee Supreme Court rejected. In *Emory*, the court of appeals awarded extra-statutory backpay because the plaintiff suffered "prejudice . . . as a result of the delayed hearing." 514 S.W.3d at 145 (quotation omitted). The state supreme court vacated that award because it "has no basis in the Tenure Act." *Id.* So too here.

## B. Section 1983 Procedural-Due-Process Claim

Williams raised a § 1983 claim alleging that the Board violated the Due Process Clause of the Fourteenth Amendment by excluding her from the reemployment list after excessing her. To prove a § 1983 procedural-due-process claim, a party must show: (1) that she has a "life, liberty, or property interest requiring protection under the Due Process Clause," (2) that the government "depriv[ed] [her] of that interest," and (3) that the government carried out that deprivation "without adequate process." *Fields v. Henry County*, 701 F.3d 180, 185 (6th Cir. 2012).

"Following a bench trial, we review the district court's conclusions of law de novo, and its findings of fact for clear error." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015) (cleaned up). After holding a bench trial on the § 1983 claim, the district court entered judgment for the Board. The district found that the first element was satisfied—Williams has a "protectable property interest" under the Due Process Clause in being placed on the reemployment list. R. 309, PID 8127. It also made a factual finding that the Board had failed to place Williams on that list until January 2019 (several years after her termination). But the district court did not analyze the other procedural-due-process elements, reasoning that it "need not decide whether this delay in

16

placing Plaintiff's name on a reemployment list amounted to a constitutional violation." *Id.* at 8128. Instead, the district court "assum[ed]" that the Board violated the constitution, and held that the § 1983 claim failed for two independent reasons: (1) Williams had not proven action "under color of law," and (2) Williams failed to prove that the Board's alleged unconstitutional actions caused her "injury" because she could not show that the Board would have "re-hire[d] her" if it had placed her on the reemployment list sooner. R. 309, PID 8128. The district court erred in granting judgment to the Board on these grounds.

## 1. Action under Color of Law

A municipality can be liable for constitutional violations carried out "under color of any statute, ordinance, regulation, custom, or usage, of any state." 42 U.S.C. § 1983. In other words, local law, policy, or custom must be "the moving force" behind the alleged constitutional violation. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quotation omitted). And where a plaintiff raises a § 1983 claim against a municipality based on the conduct of a municipal official, the plaintiff must show that the municipality gave the official sufficient "responsibility" that his "acts or edicts may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (quotation omitted). When a municipality gives an official "final authority" over a particular government activity, any "single . . . act or decision" he takes under that authority counts as municipal policy. *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 260 (6th Cir. 2015) (en banc) (quotation omitted).

We determine whether a municipal official has final authority by analyzing "state and local positive law," including "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). An official has final authority over government activity where he can "formulate plans for the

implementation of broad goals," *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (cleaned up), and where he has the power to craft "rules for . . . administration and enforcement" that are not reviewed by other government actors, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion) (quotations omitted). For example, if local law makes a municipal counsel the "chief legal advisor" to local police, her legal advice in that capacity constitutes "municipal policy." *Bible Believers*, 805 F.3d at 260. So if she advises police to act unconstitutionally, the municipality may be held liable under § 1983. *Id.* By contrast, a municipality is not liable for a "rogue" action outside an official's authority. *Lemaster v. Lawrence County*, 65 F.4th 302, 312–13 (6th Cir. 2023) (quotation omitted).

Here, the Board itself is a municipal entity subject to suit under § 1983. *See, e.g.*, *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261–63 (6th Cir. 2006). The issue, then, is whether Williams's exclusion from the reemployment list resulted from an action taken by an official whom the Board vested with "final authority" over the reemployment list. *See, e.g.*, *Bible Believers*, 805 F.3d at 260 (quotation omitted). Williams convincingly argues that Superintendent Hopson had final authority over the reemployment list, and that Hopson caused Williams's exclusion from the list.

There is ample evidence that the Board vested Hopson with final authority over all decisions related to the reemployment list. The Board's reduction-in-force policy has a section titled "Preferred List for Employment," which begins by reciting verbatim the current text of the Tenure Act's reemployment list provision. R. 60, PID 1781–86. It then states that "[t]he Superintendent shall be responsible for developing administrative rules and regulations to implement" the statutory text. *Id.* at 1783–84. To that end, the Superintendent is also "responsible for maintaining a roster of displaced employees and for ensuring compliance." *Id.* at 1784. And

the policy does not provide a mechanism for any other municipal employee to oversee or review the Superintendent's actions regarding the reemployment list. Rather, the only other parties with responsibility over the list are the Superintendent's "designee(s)." *Id.* Hopson likewise testified at his deposition that his designees in the Human Resources Department maintained the reemployment list "at [his] direction." R.60, PID 1764–65. Even the Board's counsel stated at trial that the Board "directed the *superintendent*" to handle "the reemployment list." R. 314, PID 8204 (emphasis added).

And Hopson wielded that final authority in a way that caused Williams's exclusion from the list. Eddie Jones—the Board's former staffing manager—testified at trial that Williams was not on the reemployment list in 2019 in part because the Board did not "have the vacancies filled that we needed," so "*the superintendent* decided . . . not to have any individuals put on that list in addition to what we already had." R. 314, PID 8253–54 (emphasis added). That decision was not a "rogue" act outside Hopson's legal mandate, *Lemaster*, 65 F.4th at 312–13, but rather a deliberate choice by the official who had "final authority to establish policy with respect to the action ordered," *Bible Believers*, 805 F.3d at 260 (quotation omitted). That is sufficient to support municipal liability under § 1983.

The Board does not dispute that Hopson chose not to have excessed teachers added to the list in the years following Williams's termination. Rather, the Board's sole argument on appeal is that Hopson had the authority to "*maintain* a reemployment list," but not to "decid[e] whether or not to place an individual employee's name on the list." Appellee's Supplemental Brief at 29 (emphasis added). Thus, the argument goes, as long as the Board maintains a reemployment list, it cannot be liable under § 1983 for Hopson's actions—even if that list does not contain the legally required names.

Again, we are not persuaded. The Board did not merely vest Hopson with the simple power to ensure that a document titled "reemployment list" nominally exists. It authorized him to "maintain[]" the list, to craft rules to "implement" the statutory reemployment list provision, and to "ensur[e] compliance" with the statute. R. 60, PID 1783–84. That broad mandate plainly includes not only the power to *keep* a list, but the authority to ensure that the list contains all legally required names. Indeed, it is unclear who else could possibly hold final authority over "which names" wound up on the list. Appellee's Supplemental Brief at 29. After all, the Board's policy contemplates only the "Superintendent" and his "designee(s)" managing the reemployment list. 60, PID 1784. Either way, all list-related decisions ultimately rested with the Superintendent.

## 2. Proof-of-Injury

The district court also granted judgment to the Board because Williams failed to prove that her exclusion from the reemployment list "proximately caused injury" to her. R. 309, PID 8133 (quotation omitted). The district court stated that proof-of-injury is an "essential element" of a § 1983 procedural-due-process claim. *Id.* (quotation omitted). In the district court's view, Williams could satisfy this element only by proving that her exclusion from the reemployment list caused the Board to "fail[] to re-hire her." *Id.* (quotation omitted).

Williams argues that the district court erred because she can prove injury in other ways. And she asserts that she is still entitled to judgment in her favor and nominal damages even without proving injury. The Board responds that the district court was correct because "injury" is an "essential element" of Williams' claim. Appellee's Supplemental Brief at 32-33.

We agree with Williams that the district court took too narrow a view of the kinds of injuries that are cognizable in a § 1983 action and wrongly held that a plaintiff's failure to prove injury in a § 1983 procedural-due-process claim requires granting judgment for the defendant.

20

First, the district court improperly held that Williams could prove injury only by showing that her exclusion from the list caused the Board to fail to re-hire her. Section 1983 authorizes damages for injuries "according to principles derived from the common law of torts." *Memphis Com. School Dist. v. Stachura*, 477 U.S. 299, 306 (1986). "[D]amages in tort cases are designed to provide compensation for the injury caused to plaintiff by defendant's breach of duty." *Id.* (cleaned up). Thus, a § 1983 claimant may obtain damages for the kinds of injuries compensable in tort law. *Id.* These include "not only out-of-pocket loss," but also "other monetary harms," as well as "impairment of reputation," and "mental anguish." *Id.* at 307 (quotation omitted).

Here, Williams argues that exclusion from the reemployment list cost her "an important edge in finding another job." Appellant's Supplemental Brief at 32–33. She notes that tort law permits compensatory damages for "lost chances to receive a benefit" and "interference with a . . . chance for gain." *Id.* at 34 (quoting Restatement (Second) of Torts § 912 cmt. e (1979)). Although the statute no longer provides preference to teachers on the reemployment list, Williams asserted in her trial brief that the Board chooses to provide teachers on the list with certain hiring opportunities. For example, the Board instructs principals to "consider teachers on the . . . reemployment list first when their schools ha[ve] a vacancy." *Id.* Principals must "interview teachers on the reemployment list who [are] qualified for open positions." *Id.* The Board also sends teachers on the list "for interviews at schools with vacancies that matched the teacher's qualifications." *Id.*; *see also* R. 153, PID 4164–65, 4185–87 (the Board's former staffing manager testifying that the Board "create[s] opportunities" for teachers on the reemployment list, including by organizing job fairs for excessed teachers, arranging "interviews with principals," and instructing principals to "give . . . special attention" to candidates on the list).

21

Williams argues now—and argued below—that her exclusion from the reemployment list cost her these valuable opportunities. The Board does not dispute that it offers these benefits to teachers on the reemployment list. And neither the district court nor the Board have explained why such a loss of opportunity would not be a cognizable injury in a § 1983 case. *Cf. Tercero v. Texas Southmost College District*, 989 F.3d 291, 299 (5th Cir. 2021) (holding that a § 1983 plaintiff could obtain damages for "loss of career and business opportunities" if she could prove that a "procedural due-process violation" caused those injuries, and affirming district court's denial of those damages only because the plaintiff had failed to prove that her lost opportunities were in fact "caused by the due-process violation at issue") (quotation omitted).

Second, and more fundamentally, even if Williams cannot prove injury stemming from her alleged due-process violation, that is still not a reason to grant judgment for the Board. The Supreme Court has held that a plaintiff is not required to prove actual injury to succeed on a § 1983 procedural-due-process claim. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978). In *Carey*, a public school suspended several students without a hearing, but the students could not prove that the lack of hearing caused them actual injury. *Id.* at 251–52. The Supreme Court held that even though the students "did not suffer any . . . actual injury," they were still "deprived of their right to procedural due process." *Id.* at 266. And "the denial of procedural due process" is "actionable for nominal damages without proof of actual injury." *Id.* In other words, if a plaintiff proves a procedural-due-process violation but cannot prove actual injury, the district court must still enter judgment for the plaintiff and award nominal damages. *Id.*; *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986) ("nominal damages . . . are the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury") (quotation omitted).

22

In reaching its conclusion, the district court relied on several opinions in which this court has stated that causation-of-injury "is an essential element of a § 1983 claim." R. 309, PID 8132 (citing *Roberts v. Coffee Cnty.*, 826 F. App'x 549, 554 (6th Cir. 2020) and *Doe v. Sullivan County*, 956 F.2d 545, 550 (6th Cir. 1992)). However, those were not procedural-due-process cases. Rather, one case involved an Eighth Amendment prison-conditions claim, *see Doe*, 956 F.2d at 550, and the other involved a substantive-due-process deliberate-indifference claim, which this court "analyze[s] the same as claims under the Eighth Amendment," *see Roberts*, 826 F. App'x at 554.

This difference matters. A plaintiff generally must show that her punishment caused real physical or emotional injury to prove that it was "cruel and unusual" under the Eighth Amendment. *See, e.g.*, *Oliver v. Falla*, 258 F.3d 1277, 1282 (11th Cir. 2001) (declining to apply *Carey* to an Eighth Amendment case in part because proving cruel and unusual punishment generally requires "show[ing] actual injury"). This court's holding that proof of injury is an element of an Eighth Amendment claim does not undermine the Supreme Court's holding that proof of injury is *not* an element of a procedural-due-process claim. *See, e.g.*, *Carey*, 435 U.S. at 266.

### 3. Proceedings on Remand

The district court erred in granting summary judgment to the Board on the grounds it did. But unresolved issues remain. The district court expressly declined to "decide whether [the Board's] delay in placing Plaintiff's name on a reemployment list amounted to a constitutional violation." R. 309, PID 8128. Indeed, the district court held only that Williams satisfied the first element of a procedural-due-process claim—i.e., that her entitlement to placement on the reemployment list is a "property interest requiring protection under the Due Process Clause." *Fields*, 701 F.3d at 185. The district court did not actually decide whether Williams satisfied the

latter two elements of her claim—whether the Board's delay amounted to a "deprivation" of Williams' property interest, and whether the Board failed to provide Williams "adequate process." *Id.* The parties have not briefed these remaining procedural-due-process elements on appeal. Instead, Williams states that if she prevails on the color-of-law and actual-injury issues, this court "should remand for a determination of damages," Appellant's Supplemental Brief at 36, and the Board argues only that the district court's "ruling should be affirmed," Appellee's Supplemental Brief at 34. It seems that the parties have skipped over the fact that the district court never actually held that Williams proved all the elements of her procedural-due-process claim.

We decline to analyze those unbriefed elements on appeal. We are "a court of review, not first view." *Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021) (quotation omitted). We thus remand for the district court to analyze the latter two elements of the procedural-due-process claim and decide in the first instance whether Williams has proven a procedural-due-process violation. If it finds that Williams has done so, the district court should evaluate whether Williams is entitled to compensatory damages or mere nominal damages. In evaluating compensatory damages, the district court should consider the full range of damages available to a successful procedural-due-process plaintiff.

## C. Retaliatory Termination Claims

Williams argues that her firing was based on a retaliatory motive in violation of Title VII of the Civil Rights Act of 1964. The district court evaluated Williams's Title VII retaliatory termination claim under the *McDonnell-Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–07 (1973). Under that framework, Williams "carries the initial burden of establishing a prima facie case of . . . retaliation." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020). If Williams establishes a prima facie case, the burden shifts to

the Board, which "must articulate some legitimate, non-discriminatory reason for [its] actions." *Id.* (cleaned up). The burden then shifts back to Williams to prove that the Board's "stated reasons are pretext." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015).

The district court held that Williams established a prima facie case of retaliatory termination. It then found that the Board offered a legitimate nondiscriminatory reason for the firing: the state revoked the grant that funded the Adult Education Program. When the Board lost that grant funding, it terminated the entire Program and all teaching positions within it, including Williams's position. The burden then shifted back to Williams to prove that the Board's stated reason was pretextual. The district court held that Williams failed to meet that burden. Williams challenges that ruling on appeal. Because the Board does not argue that Williams failed to establish a prima facie case, the only issue is whether the district court erred in finding that Williams failed to prove pretext.

A Title VII claimant may establish pretext by showing that the defendant's stated reasons for the termination "had no basis in fact," "did not actually motivate [the] termination," or "were insufficient to motivate discharge." *Yazdian*, 793 F.3d at 651 (quotation omitted). First, Williams argues that the Board's stated reasons have "no basis in fact" because Williams was the only tenured full-time teacher fired after the Board lost its grant funding. Second, she argues that she can alternatively show pretext through the so-called "cat's paw" doctrine, under which "the discriminatory animus of a different employee can be imputed to the decision-maker." Appellant's Supplemental Brief at 38.

We review a district court's grant of summary judgment de novo. *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). When considering whether there is a genuine dispute of

material fact, we must take Williams' evidence as true and draw "all justifiable inferences" in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### 1. Williams fails to prove pretext by arguing that she was the only full-time tenured Messick teacher who was terminated.

Williams argues that the Board's stated reason for the termination "had no basis in fact" and was thus pretextual because Williams was the only full-time tenured teacher to be terminated after the grant was revoked. She asserts that other full-time tenured teachers at Messick "continue[d] collecting a paycheck" from the Board even after the Adult Education Program was cut. Appellant's Supplemental Brief at 39. Thus, she argues, the Board's elimination of the Program "*was really just a 'reduction' of Dr. Williams*." Appellant's Supplemental Reply at 21.

This argument rests on an incomplete understanding of the record. When the Board lost its grant funding, Superintendent Dorsey Hopson decided to "shut . . . down" the entire Adult Education Program. R. 60, 1756. The Program was largely funded by the grant, and Hopson decided that without the grant funding, the Board "was not going to continue doing adult ed." *Id.* at 1748. That meant eliminating all teaching positions in the Program—i.e., all teaching positions at Messick. At the time, several full-time tenured teachers (including Williams) worked at Messick—but Williams was the only one who worked at Messick *exclusively*. The other full-time tenured teachers split their time between Messick and other schools. When the Board cut the Adult Education Program, those teachers lost their positions at Messick, but kept their jobs elsewhere in the district.[2]

---

[2] At her deposition, the Board's Labor Relations Director, Chantay Branch, testified that many teachers worked at Messick as an "extra part-time job in addition to [a] full-time teaching position" elsewhere in the district. R. 51, PID 928. When the Adult Education Program ended, those teachers lost their part-time jobs at Messick but kept their jobs as "full-time teacher[s] somewhere else." *Id.* Meanwhile, Williams and other teachers who worked exclusively at Messick were "identified for layoffs." *Id.* at 927.

Williams, on the other hand, did not have a job elsewhere in the district. That is why other tenured teachers "continue[d] collecting a paycheck" from the Board even after the grant was revoked—because, unlike Williams, those teachers had other jobs outside the Program. Appellant's Supplemental Brief at 39. As Superintendent Hopson explained in the letter to Messick staff, if a teacher was "employed with the district in another capacity outside of the Adult Education Program," that other position would "not be impacted." R. 122-5, PID 3330.

The record shows that the Board even-handedly eliminated all teaching positions within the Adult Education Program. Williams has not provided any evidence to create a genuine dispute of material fact as to that conclusion.[3]

### 2. Williams fails to prove pretext under a cat's-paw theory.

Williams alternatively argues that she can prove pretext under a "cat's paw" theory. Appellant's Supplemental Brief at 38. Ordinarily, an employer defendant is liable for retaliatory termination only when the supervisor who made the firing decision was *himself* motived by retaliatory animus. *See, e.g.*, *Mys v. Michigan Dep't of State Police*, 886 F.3d 591 (6th Cir. 2018). But in some cases, a firing decision is caused in part by a supervisor's reliance on the biased views of certain other "intermediate employee[s]." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012). Under the so-called "cat's paw" doctrine, a plaintiff may prove retaliatory

---

[3] In her supplemental reply brief, Williams argues for the first time that the Board also did not terminate certain "full-time employees" in Messick's "administration," such as "Principal Griffin and Assistant Principal King," when the grant was revoked. Supplemental Reply at 20. This presents a shift in how Williams has framed her Title VII retaliatory-termination claim. Williams' position in the district court and in her opening brief was that she is a tenured teacher, so the proper comparator for determining pretext is how the Board treated other tenured teachers at Messick. *See, e.g.*, Appellant's Supplemental Brief at 39 (arguing that the Board's proffered reason "is pretextual because Dr. Williams was the only full-time, tenured teacher to be terminated."). Before the reply, she did not argue that she ought to be compared to Messick administrators like Principal Griffin. And in making this assertion on reply, she does not cite the record—so it is hard to evaluate whether it is proper to compare the Board's treatment of tenured teachers like Williams with the Board's treatment of Messick administrators. In any event, "arguments raised for the first time in a reply brief come too late." *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) (citation omitted).

termination by showing that a biased "intermediate employee influence[d] the unbiased decision-maker to take an adverse action." *Id.* (quotations omitted).

Here, Williams argues that she can show pretext through the "impermissible motivations" of Messick Principal Rochelle Griffin and Labor Relations Director Chantay Branch. Appellant's Supplemental Brief at 38 (quotations omitted). Griffin and Branch did not fire Williams themselves, but Williams argues that the biases of Griffin and Branch can be "imputed to" Superintendent Hopson under the cat's paw doctrine. *Id.* The Board argues that the cat's paw doctrine does not apply here because there is no evidence that any purported bias from Griffin or Branch caused Williams's termination.

The discriminatory acts of a non-decisionmaker employee can establish cat's paw liability only if those acts are "a proximate cause" of the "ultimate" adverse employment action against the plaintiff. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Chattman*, 686 F.3d at 351 (same). Here, Williams has failed to create a genuine dispute of material fact regarding whether the animus of Griffin and Branch was a proximate cause of her termination.

Superintendent Hopson made the ultimate decision to terminate all teaching positions in the Adult Education Program, including Williams's position. And there is no evidence that Griffin or Branch had any role in that decision. At his deposition, Hopson explained that when the grant was revoked, Hopson had three options: (1) fund the entire Program through the Board's "general fund," (2) "reapply" for the grant, or (3) shut the whole program down. *Id.* at 1755. On the recommendation of his chief academic officer, Hopson chose Option 3. When Hopson made that choice, he knew nothing about Williams—he did not know that she had reported misconduct at Messick, he had "no personal knowledge of [her] work history," and "there was never anyone that told [him] that Dr. Williams had complained" about anything. *Id.* at 1755–61.

28

Williams argues that Hopson effectively admitted that he relied on Griffin and Branch in choosing to fire Williams. That argument rests on the following exchange at Hopson's deposition:

> Question: As far as Dr. Williams is concerned and her not being placed on the preferred list and not getting any of the jobs that she's applied for, were you relying on the people who were in charge of those departments and in charge of doing that to do their jobs?
>
> Answer: Yeah.

R. 60, PID 1756.

This testimony does not establish cat's-paw liability through Griffin and Branch for Williams's firing for several reasons. First, the question does not mention Griffin or Branch, and none of the surrounding deposition testimony involves Griffin or Branch. So Hopson's agreement to a question that vaguely references "the people who were in charge" does not establish Hopson's reliance on Griffin or Branch in particular. Second, this question references things that happened only *after* Williams was fired—i.e., "not being placed on the preferred list" and "not getting any of the jobs that she's applied for." *Id.* But Williams's Title VII claim pertains solely to her *termination*—she failed to exhaust her retaliatory failure-to-rehire claim (and has not appealed that issue), and she abandoned all other Title VII claims below. Hopson's agreement to a vague question about relying on unspecified department heads for post-termination actions does not establish that he relied on Griffin and Branch for the firing itself.

Indeed, earlier in his deposition, Hopson was specifically asked whether he was "relying upon the advice of the people that worked under" him when he "signed [Williams's] letter of termination." R. 60, PID 1755. Hopson answered that he relied on the "recommendation" of his "chief academic officer" to terminate the whole Adult Education Program. *Id.* Williams provides no evidence that Griffin and Branch had anything to do with that particular decision. Thus, no

reasonable jury could find that any retaliatory animus harbored by Griffin or Branch proximately caused Williams's termination.[4]

### III. Conclusion

For the reasons set out above, we REVERSE and remand for further proceedings on the § 1983 procedural-due-process claim and AFFIRM in all other respects.

---

[4] The district court correctly granted summary judgment to the Board on the TPPA claim for the same reason it granted judgment on the Title VII claim. The TPPA permits liability where a party is "terminated *solely* for refusing to . . . remain silent about[] illegal activities." Tenn. Code Ann. § 50-1-304(b) (emphasis added). Williams' arguments for why her reporting was the sole cause of her termination are largely duplicative of her Title VII pretext arguments. For the reasons explained above, no reasonable jury could conclude that Williams' reporting was the sole cause of her firing.

**ALICE M. BATCHELDER, Circuit Judge, concurring.** I agree with the majority that we should remand this case to determine whether Williams satisfied the elements of a procedural-due-process claim. I write separately, regarding §IIB, to note what we do not decide here: whether the right to be placed on the reemployment list provided Sonya Williams with a protected property interest, given that placement on the list did not ensure preferential treatment in hiring. Here, the district court said that Williams's right to that placement was a protected property interest under Tenn. Code. Ann. § 49-5-511(b)(3). The parties do not dispute and have not briefed this issue on appeal. Accordingly, we do not decide whether the Tennessee Tenure Act's reemployment list provisions confer a "life, liberty, or property interest requiring protection under the Due Process Clause." *Fields v. Henry County*, 701 F.3d 180, 185 (6th Cir. 2012).